Good afternoon, Your Honor. I'm Eric Christensen, counsel for the petitioners in this case. I'd like to reserve five minutes for rebuttal. The court's opinion in this case is riddled with obvious legal errors and therefore must be reversed. To start with, the court gets the doctrine of the zone of reasonableness all wrong. It's clear that the rates here are confiscatory. There's a subsidy term in the rate that requires petitioners to pay 32% above the cost of the rate. Also, before you go into that detail, would you answer for me how we get to the issue of interstate commerce? Yes, so the interstate commerce problem here... It's only affected, but I think it's Grant County. Yes, but the District Court's error here is that it only looked at whether the rate was discriminatory on its face. It did not look at the intent or the actual effect of the rate. And the evidence is clear that this transfer of wealth is imposed on interstate commerce because cryptocurrency operates by nature on the internet, which operates in interstate and international commerce. So it imposes this 32% burden on interstate commerce and transfers it to the interstate. Which means that federal courts now acquire jurisdiction over all facilitating traffic on the internet? Not at all, Your Honor. You acquire jurisdiction only to the extent that there's a violation of the Commerce Clause. Yes, but your analysis, Mr. Christensen, suggests that because this involves the internet, that therefore it affects interstate commerce. And that very, very broad rule would give us jurisdiction over all utility rates. Well, I don't think it's different than any other action by local utility or local government where the intent and the result of the action is to impose an undue burden on interstate commerce that favors local economics. And I'd like to go back to Judge England's question, because I think it's a very good one. That is, I want you to be very specific. How does this affect the interstate market? How does this affect interstate rates? It's going to keep people from coming into Washington, to Grant County? Is that the problem? No, the problem is that it imposes economic burdens on interstate commerce, transfers those... Okay, but what interstate commerce? What are you talking about? Interstate commerce and cryptocurrency, which is by its nature, as I said, operates in interstate commerce because it's based on the internet. And it requires... Yeah, but that means that somebody in Southern California, even if they weren't paying a special rate like the number 17 here, could claim that they didn't like the rates, and it would be a federal case because they're involved in cryptocurrencies. The rule you're advocating for is extremely broad. I'm trying to figure out if you've gotten any narrowing principle, and I haven't heard anything yet. So the narrowing principle is that you have to demonstrate discrimination against interstate commerce, which is... I'm all ears, counsel. Yeah, so the discrimination against interstate commerce is because Grant County PUD recognized that the cryptocurrency customers are predominantly out-of-state. They have no representation in Grant County because they don't vote there. They're not located? They're not located? Well, the They're not shipping this power out of county. They're not shipping it out of state. But the burden... It's being used in facilities in Grant County. That doesn't make it interstate. No, but what makes it interstate is the fact that those facilities are operating interstate commerce. And so the burden is imposed on interstate commerce. It's as if they had a factory in Grant County that was owned by out-of-state interests. Grant County decided those out-of-state interests don't vote here. Your principal counsel would allow Avis Redicar to come in and say, we don't like how much we're having to pay for our power bill every month, and we operate in interstate commerce. No, it has to... Well, I think the question is whether somebody who operated interstate commerce and otherwise had no connection to Grant County would have standing here. I think that's obviously wrong. The burden is being imposed directly on the plaintiffs here who operate in interstate commerce. And that's the reason that the link to interstate commerce is the burden imposed on them. But that doesn't mean that Avis Redicar in California would have standing to bring this case because they're... But Avis Redicar in Grant County would have standing under your theory if they didn't like how much they were paying in Grant County. But they would have to demonstrate that the rate they were paying was different from the rates that were being charged to other customers that were similarly situated. And so in this case, the problem is that the customers who are in the residential farm and small business rate class are being charged 30% below their actual cost of service. Right. But that's an argument that emerging industries is different from other industries in Grant County. And that would be an argument that they're being discriminated against. Why did you make that argument? I haven't heard that. That is the argument. That is the argument. Grant County singled out... But I haven't heard that. Singled out? Yeah. So the evidence is clear that Grant County singled out cryptocurrency. The documents that they were prepared, the comments say, we're doing this to single out a cryptocurrency industry. We're calling it evolving industry to make it look like we're not singling them out. But in fact, we are singling them out. We are imposing this burden on them. And it's far above the cost of service. If there's a legitimate basis for... Councilor, are there any other entities other than cryptocurrencies in the Grant County FUD's evolving industry category right now? No. There are no other... And that demonstrates the arbitrariness of this. Because when another industry came in, the Cascade Clean Energy, wanting 350 megawatts of power, far above what our clients would require, in an equally experimental industry that had never gotten beyond the experimental stage for its technology, they weren't even considered for evolving industry. And that demonstrates that that confirms the comment that was in the draft white paper, that they were intending to single out cryptocurrency to pay these particular burdens. Councilor, I thought I'd read someplace in the record that some of the cannabis industries might go into this emerging industry category. Well, they designed it specifically to exclude cannabis industries, even though cannabis industry is emerging high risk, potentially a huge burden on other rate payers and so on. And the comments in that white paper, the draft comments in the white paper indicate that they and other industries, despite the fact that they admit that the criteria that they've used would, if you read them literally, cover lots of Grant County industries. And so the thing that makes this unique is not only that they charge this rate, but that they are transferring, they're imposing a really huge subsidy term on rate schedule 17 that has nothing to do with cost of service. This is simply a transfer of wealth from these industries operating in interstate commerce to locally favored interests in Grant County. That's far different than an ordinary rate case where whoever's in any particular customer class is charged actual rate of service based on demonstrable criteria of how much it costs to serve them. Here, they're going beyond that by adding this 32% surcharge that has no relationship to the cost of service. All it does is transfer wealth from this interstate industry into the pockets of locally favored interests in Grant County. That's what makes this case unique. And I had understood that one of the reasons that the public utility district charged more here to these emerging industries is that these were new industries, they were high rate, they were high users, and they were going to place, they were putting demands that they had not seen before. They were also concerned that these industries might be able to pull out of Grant County quickly. That is, that they were sort of floating, they could float quickly from one place to another depending on what kind of electrical rates they could get because it was a major component of their... Yes, well, all of those assertions are contested in this case. But in any event, even if it was correct, there are five elements of rate schedule 17. Four of them already cover the risks that you're talking about. So there was an added element for transmission expansion, requiring them to essentially pay up front for anticipated transmission, even though it probably would never occur. Similarly, there was a surcharge imposed for use of the distribution system, even though there was no evidence that cryptocurrency actually damaged any equipment in the distribution system. So those risks are covered by other elements of the rate schedule 17. The subsidy element is just that, a pure subsidy. And the Grant County witness says that it is intended explicitly as a into the pockets of so-called core customers, which are locally favored interests in Grant County. So I think that the error committed by the district court is clear here because it ignores the evidence that even though this is facially neutral, the evidence demonstrates that... Counsel, do you have a remedy in Washington courts to challenge RS-17? Yes, Your Honor. There's a remedy under RCW-54-2408-080. And it's been pretty frequently that rates have been challenged. And have you challenged it? No, the state law challenges here were incorporated into the federal challenge. So it used to be pendant jurisdiction back when I was in law school. Okay. And the challenge in Washington is strictly in the Washington courts. You don't have a public utility commissioner, somebody else above the blood. Well, right. So in TD's case, they operate independent of the authority of the Utilities and Transportation Commission. And so your remedies are at the commission itself, which doesn't work here because we have no vote in Grant County. And then in the Washington court, they operate independently of courts. So there's no UTC involvement. To finish the thought on the dormant commerce clause violation, this is also a clear violation of the Supreme Court's opinion in New England Power, which held that states are prohibited from granting favorable economic access to the natural resources of their states. In that case, New Hampshire developed a rate that captured all the benefits of its hydropower resources for New Hampshire customers and imposed those burdens on out-of-state customers. And that's exact parallel here. That's exactly what happened. What out-of-state customers was the putting pressure on? In the case, they were actually discriminating against out-of-state users. They were trying to... Right. And the difference is... If the Massachusetts company had a factory in New Hampshire that operated interstate commerce, as most factories do, and New Hampshire decided to capture all the benefits for local customers, residences, and so on, and imposed extra burdens on that factory that's operating in interstate commerce, I think that the result from New Hampshire would be exactly the same. You can't do that because that provides favorable access to in-state customers, discriminates against places... I thought in the New England case that the New Hampshire law forbid them from wheeling the power out-of-state. No, Your Honor. It didn't prevent them. It said, well, so the law said you're supposed to wheel it out-of-state. It was never enforced until it started to get a little tight. Then they enforced it not by prohibiting out-of-state wheeling, which they couldn't do without actually cutting down the transmission lines, but they developed this rate that captured the benefits of New Hampshire power for New Hampshire customers and imposed the extra burdens on out-of-state customers. That's parallel to what's happening here, because these cryptocurrency businesses operate primarily out-of-state, bear that burden. Does the PUD order prohibit the wheeling of the power out-of-state? No. In fact, the issue here is that the rates that are charged to customers operating in interstate commerce versus locally favored customers, the benefits are being captured and kept within Grant County. The burden is being placed on businesses that inherently operate in interstate commerce. Counselor, did you want to save any time for rebuttal? Yeah, I guess I can stop now and save the rest of my time. Thank you. All right. Thank you, Counselor. Mr. Johnson? Your Honor, Dale Johnson on behalf of PUD number two of Grant County and the individual defendants of this matter. I'd just like to pick up where Judge Bybee left off with Mr. Christensen. First of all, when we consider the Dormant Commerce Clause claim here, what is most important is whether or not there is, in fact, in purpose or effect, or facially for that matter, an impact on interstate commerce or a purpose to affect interstate commerce. The bottom line here is, Rate Schedule 17 applies to cryptocurrency miners who are every cryptocurrency miner operating in Grant County is subject to Rate Schedule 17 without regard for where they're incorporated, without regard for where they are operating, that is, whether they're operating in terms of their mining out of state or internationally, or only in Grant County. They all pay the same rate. This is not a set of facts that parallels those in New Hampshire, which was, in fact, as Judge Bybee noted, an exportation ban by the state of New Hampshire, which precluded out-of-state entities from benefiting from the sale of New Hampshire power. That is not what has happened here. What has happened here is, in 2017, Grant County, which is a rural public utility district that produces power at the Priest Rapids project on the Mid-Columbia River and sells it to its customers in rural Grant County, Washington. They were confronted with an extraordinary demand for power from the state. They needed to respond in a way that would allow them to continue to provide power to all of its customers, not only to the new demands placed on it by cryptocurrency, but also the demands of residents, irrigators, and other agricultural interests. To do that, they implemented a rate that recognized the unique and emerging nature of cryptocurrency mining. Counsel, the PUD called this an emerging industries rate. Are there any other emerging industries other than cryptocurrencies covered by RS-17? There are no other emerging or evolving industries, Your Honor, that are currently subject to rate schedule 17. You noted the cannabis industry, and Mr. Christensen referred to some others. What is important to note is one of the key provisions or criteria that triggers rate schedule 17 is that the demands need to be in excess of 5% of the total load of the PUD. Then, of course, there is a question of whether there is a regulatory or business risk. The PUD assesses that on an annual basis. With regard to cannabis, there has never been a suggestion that they would even approach that kind of load and draw that much electricity from this PUD. It does not fit the bill. Does that not create the possibility, then, that what you have is a rate for one customer or one group of customers? It is not really a neutral rule. You have extra surcharges because once they move their stuff into Grant County, it is hard for them to move it back out. Therefore, they are stuck. It is the bilateral monopoly situation. Right now, they are stuck. They need your power. You can charge them any rates you want. It does not appear to be a neutral rate. All the cryptocurrencies are equal, but the cryptocurrencies are not equal to any other really emerging industries. Your Honor, first of all, I think it is important to note that in reality, cryptocurrency was driving this problem. There is no doubt that schedule 17 emerged from the extraordinary demands placed on Grant County PUD by the cryptocurrency industry. However, when the PUD stepped back and looked at this, they concluded that it is possible that in the future there could be other evolving industries that would present the same kinds of challenges to the district that cryptocurrency did. What they did was they created a set of neutral criteria to be applied and assessed against any industry that might fit that category. They do that on an annual basis. There is an annual review process. The cryptocurrency entities now who are contemplating coming into Grant County are on notice that this is the rate they will pay. They are also on notice that every year, the rate will be reviewed to ensure that they have not, in fact, evolved beyond being an evolving industry that presents the kind of risks associated with cryptocurrency presently. Other entities will be subject to the same kind of review. If they meet the criteria, they will then, if the commission determines it's appropriate, go into the evolving industry class. I would note also, Your Honor, that it is common practice with regard to Grant County to assess what Mr. Christensen refers to as a subsidy. This is just one component of the rate, but essentially what it does is it, in fact, results in certain customer classes paying more than the cost to serve them, and other customer classes sometimes paying less or paying just that amount. Cryptocurrency evolving industry is not unique in that regard. Other large consumers of power in Grant County in other rate classes also pay a considerable, if you will, what we call cross-margin or subsidy or social benefit charge. This is not something new, and it's certainly within the broad discretion that PUD is allowed under Washington rate-making laws. Counsel, I understand that one of the factors that went in here is, in order to meet the increased load here, that you might have to increase your capacity. That places an obligation on the PUD to expand its facilities, to get additional generators, to do something in order to meet the demands of its customers. That's a capital investment, and it may be a big investment. Of course, part of the risk is that you make that investment, and then your customer pulls out of accounting. How movable are the cryptocurrencies? In fact, your honor, this is one of the factors that the staff and the commission took into account, and that is that they're extremely mobile. They're extremely capable of chasing cheap power, because what this involves is, essentially, buying or constructing a big warehouse, supplying lots of electricity to it, and hooking up numerous, extremely powerful computer servers that operate 24 hours a day, seven days a week, to do what cryptocurrency miners do with regard to validating the blockchain. This was a factor that was taken into account by the commission. In their legislative capacity, they concluded that it was a real factor that they needed to guard against. You're right, your honor. The rate includes a number of factors. Some are what we would call related to distribution. Some are related to transmission. Some are related simply to the cross-subsidy term, or social benefit charge, which is simply an exercise of the utility district's inherent authority under Washington rate-making law to establish, that is set rates, and allocate rates in a way that it feels is best to serve all of its customers. So, all customers in Grant County don't pay the same rate for their electricity, but cryptocurrency customers, such as the appellants or any other entity that ultimately is part of the EI rate schedule 17 rate class, they're not unique in that regard. So, I think at the end of the day, again, on this Dormant Commerce Clause question, if you look at the command of the Supreme Court, the question is, is what Grant County did driven by, the Dormant Commerce Clause is driven by concerns about economic protectionism that result in disparate treatment of out-of-state entities vis-a-vis in-state entities, and that's not what is happening here. All of these entities, the appellants, cryptocurrency entities, and any other entity that might in the future be subject to rate schedule 17 are being treated the same. And to the extent that there is this idea that, well, because we have subjected them to this rate, there's some excessive burden on interstate commerce. That's what the situation in the Orleans case, Orleans Sons and Daughters versus Hennepin, it's an Eighth Circuit case that we cited in our briefing, which essentially said that market access theory isn't a colorable cause of action under the Dormant Commerce Clause. Because you come into a, in this case, a county, a PUD district, you're operating there, you're functioning there, you're doing your business there. And then because you feel that you're being treated poorly because you're paying too much for your electricity, you argue there's a violation of the Dormant Commerce Clause because we just so happen to be operating out there in the At the end of the day, this court, that is the district court, looked at whether there was a facially discriminatory rate here. It did not find one because it is not. It looked at the purpose and it articulated the purpose for why this rate schedule was implemented and are promulgated and implemented. And it looked at its effect. And certainly if you look at the pipe balancing test, the PUD's interest in providing electricity, in recovering its costs, in allocating rates across the different rate classes outweigh the appellant's interest in having a lower electricity rate. And at the end of the day, no matter what the appellants call it, they are asserting that they have a federal constitutional right and a federal statutory right to a specific utility rate or certainly a lower utility rate, a lower electricity rate, which is not the law. It's not the law under the federal due process clause, either as a matter of procedural due process. It's certainly not the law as a matter of substantive due process. With regard to their procedural due process claims, as we discussed in our briefs, it is beyond a doubt on both a federal and state level that electric utility rate making is a legislative act to which procedural due process under the federal constitution does not apply. And the court's inquiry with regard to procedural due process can simply stop there. Similarly, with regard to substantive due process, the appellants have failed to cite authority for the proposition that they're entitled, as a matter of federal constitutional law, to a lower utility rate. And even if they were able to articulate a constitutionally protected interest, there are two components to a substantive due process challenge. They also have to show that the PUD engaged in malicious conduct that shocks the conscience. And if you look at the facts and the record of this case, that's not what happened. The public utility district is reacting to almost an existential threat here to its ability to provide power to all of its customers. It certainly doesn't suffer from unconstitutional vagueness, which was presented as a state court claim here. There was never any doubt that once this rate was adopted, the appellants were subject to that rate. And as we've noted in our briefing, and as the district court found, there's no no right or remedy available to these appellants to come into federal court to bring a private cause of action to vindicate a right under the Federal Power Act, which arguably doesn't even apply here. Because the only way it would would be if Washington State had not appointed a to the Federal Power Act, or there was some dispute among the states. All right, counsel, you've exceeded your time. Thank you, Your Honor. Rebuttal. Counsel, you need to unmute. Thank you. Sorry, Your Honor. So first of all, Mr. Johnson says that the court looked at whether grade schedule 17 was discriminatory in purpose or effects. That's whether it was spatially discriminatory and then stopped, ignoring the evidence that we provided that it was discriminatory in purpose and effect, and intended to transfer or impose a burden on interstate commerce and transfer that wealth into the pockets of favored local customers. That is clear legal error under the standards which require that the judge look at purpose and effect to see whether this is an ingenious mechanism to discriminate against interstate commerce, not just to look at whether it's discriminatory on its face. Second, I think I wish I had come up with Judge Bybee's characterization of this as rate gerrymandering. That's a good description. Mr. Johnson says there are neutral criteria that might be applied if future industries show up that meet the criteria. In fact, a future industry did show up, clean energy, as I mentioned before, completely experimental, looking for 350 megawatts of power, which is more than half of Grant's current load. Yet there wasn't even any consideration of characterizing them as an evolving industry. Proving that what was said when they were putting this together in the comments, that this was just intended to make it look like they weren't singling out cryptocurrency, is just wrong. On the question of mobility, it may be that cryptocurrency generally is mobile, but that's not the case for the petitioners in this case. They've invested about $14 million in real estate, in electrical equipment, in buildings, in other fixed assets in Grant County. That makes them not mobile. Characterizing them as mobile based on these evolving industry criteria, which they shouldn't have been. That was one of the arguments that we would have raised, but we never got the chance. Because as the general manager of Grant said, the determination to classify cryptocurrency as an evolving industry was a done deal before the criteria were even adopted. A basic violation of procedural due process. Counsel, you've exceeded your time. Could you wrap up, please? Yes. I think that the district court's decision is replete with legal errors that require it to be reversed and remanded. I'm happy to answer any other questions. Are there any questions? All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court that completes our calendar for today. We are in recess until 1 o'clock p.m. tomorrow.
judges: Rawlinson, Bybee, England